IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY WELSCH | : | CIVIL ACTION |
| | : | |
| v. | : | No. 07-4578 |
| | : | |
| TOWNSHIP OF UPPER DARBY, et al. | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                           **August 26, 2008**

      Defendants Investigator James R. Thrash, and Police Officers Thomas Fitzpatrick and Jerome Brown move for summary judgment arguing they lawfully searched and seized Plaintiff Mary Welsch's firearms during their investigation of her father's death from a gun shot. Defendants Upper Darby and Superintendent Michael Chitwood move for summary judgment contending the Upper Darby's firearm return policy, requiring applicants seeking the return of their firearms either obtain a court order or Superintendent Chitwood's permission, is constitutional. Upper Darby argues the record does not support a finding of *Monell*[1] liability. Plaintiff Mary Welsch disputes the lawfulness of the search and seizure, the firearm return policy's constitutionality, and Upper Darby's liability.

      I conclude the police lawfully searched in response to the emergency and, alternatively, two occupants with authority consented to the search and seizure of the firearms. To the extent Upper Darby's firearm return policy gives Superintendent Chitwood unfettered discretion, the policy is unconstitutional. Whether Superintendent Chitwood has qualified immunity is reserved for the end

---

[1] *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-91 (1978).

1

of trial.  The record supports *Monell* liability for Upper Darby as to the firearm policy, but not the search and seizure.

**FACTS**

On August 23, 2007, a 911 call reporting a gun shot led Upper Darby Police Officer Brown to the home of Mary Welsch and her father, Eric Welsch.  Upon entering the home, Officer Brown saw the decedent, Eric Welsch, slumped over in front of a chair; blood was splattered on the decedent's face, the chair, and a .38 caliber gun close to the decedent's body.  The decedent's son, Eric Welsch, Jr., and 20-year-old grandson, Dylan Kurtz, were the only people in the home when the gun shot was fired.  Eric Welsch, Jr., told Officer Brown the decedent had shot himself.  Paramedics arrived and pronounced Eric Welsch dead.

In his incident report, Officer Brown immediately wrote up the incident as a suicide.  At the scene, Detective Thrash saw what Officer Brown saw: the decedent's body, the decedent's wound, and a .38 caliber gun close to the body.  Detective Thrash knew a firearm caused the decedent's death by examining the decedent's wound.  Both Welsch, Jr. and Kurtz told Detective Thrash the decedent, a gunsmith, had shot himself.  His observations and experience led him to believe suicide was a possibility, but his experience informed him murders could be staged as suicide.  Thus, Detective Thrash could not conclude suicide until after receiving the medical examiners' report.  In the mean time, Detective Thrash approached the scene as a death investigation.  During this investigation, Officer James Lutz conducted a protective sweep of the kitchen and the decedent's bedroom.  He saw numerous firearms in plain view in these rooms including in the decedent's open closet.

When police officers questioned Kurtz regarding the locations of the decedent's guns, Kurtz

cooperated and answered they were in the decedent's bedroom, the kitchen, the basement, and in safes in the attic. Armed with this information, Detective Thrash immediately sent officers to seize the firearms in these locations. Kurtz and Welsch, Jr., did not object or attempt to stop the officers from searching these areas. Upon entering the decedent's bedroom, officers seized the firearms on the bed and in the open closet, not the knives on the decedent's bed. Officer Brown admitted to opening containers in the basement, but did not seize anything from these containers or drawers. The officers did not search the safes in the decedent's bedroom, basement, or attic. The officers only entered the basement, attic, kitchen, and decedent's bedroom. In total, the officers seized 16 firearms. Det. Thrash Dep. 95:22.

Officer Thomas Fitzpatrick recorded all of these items on four weapon receipts, and asked the decedent's sister, Diane Welsch, to sign the receipts. Officers admitted different receipts were used for different forms of property. Seizure of firearms required weapons receipts, but other forms of weapons such as knives or baseball bats required property receipts. A baseball bat, however, would require a weapons receipt if it was used to threaten another individual. The weapons receipts required those seeking the return of firearms to "contact the Delaware County District Attorney's Office and learn how to obtain a 'Return of Property' order."[2] Def.'s Summ. J. Mot. Ex. 4 (Weapons

---

[2] The weapons receipt reads:

> The Upper Darby Police Department Police Department is committed to providing a safe environment to all its residents. To this end, we have found it necessary to seize a weapon that was in your possession. The seizure of this weapon is solely for the purpose of keeping persons safe. The following steps may be taken to retrieve your weapon:
> 1.    Contact the Delaware County District Attorney's Office to learn how to obtain a "Return of Property" order. Please be advised that it may be necessary for you to obtain an attorney to petition the court for this order. This process must be completed within 60 days or your weapon will be forfeited and destroyed by the Upper Darby Township Police Department.

Receipt). Superintendent Chitwood testified those seeking to retrieve their firearms or another weapon used to threaten another person are required to file court orders. Superintendent Chitwood's Dep. 39:1-24; 40:1-11. The language of Upper Darby's property receipts were never produced to the Court.

Following the search and seizure of the firearms, Diane Welsch asked Officer Fitzpatrick why all the firearms were being taken. He told her "it was policy." Diane Welsch's Dep. 27:1-14. Officer Fitzpatrick and Detective Thrash informed her the decedent had shot himself to death. *Id*. 28:11-20. Diane Welsch also asked whether the police were going to keep the firearms. Detective Thrash assured her they were not keeping the firearms and advised her to contact Captain Kenney and follow the instructions on the weapons receipt to retrieve the firearms.

Mary Welsch, decedent's daughter and executrix of the estate, first attempted to retrieve the firearms from the Upper Darby police station. The attending clerk told her she would have to follow the instructions on the weapons receipt to obtain her firearms. Following the instructions, Mary Welsch then called the Delaware County District Attorney's Office. Deputy District Attorney James Mattera stated the District Attorney did not have her firearms, there was "nothing that his office could do because the weapons were not used in any crime," and recommended she call the Upper Darby Police Department. Mary Welsch's Dep. 29:23 - 30:3. Mary Welsch then contacted Captain Kenney, who informed her she needed a court order.

---

    2.    Upon receiving this order, the original order should be brought to the Upper Darby Police Investigations Unit. When the authenticity of the order has been verified, it will be relinquished as soon as possible.
Please note that if you do not begin the process of recovering your weapon within 60 days it will be considered abandoned property and will be destroyed.

Def.'s Summ. J. Mot. Ex. 4 (Weapons Receipt).

Captain Kenney discussed Mary Welsch's general circumstances with Superintendent of Upper Darby Police Michael Chitwood. The Upper Darby Police Firearm Policy, effective since June 22, 2007, provides firearms obtained by the Investigations Division "will not be returned to the owner without a court order from a Common Pleas Judge or permission of the Police Superintendent." Def.'s Summ. J. Ex. 6 (Upper Darby Policy). Superintendent Chitwood, however, explained if an applicant shows proof she owns the firearms and can lawfully possess the firearms, she need not obtain a court order to retrieve her firearms. Superintendent Chitwood's Dep. 90:9-92:10. The policy, however, lacks Superintendent Chitwood's explanation or any other circumstance merely requiring Superintendent Chitwood's permission instead of a court order. Contrary to his testimony, Superintendent Chitwood advised Captain Kenney a court order was necessary to return firearms. Mary Welsch had been continually instructed to abide by the instructions on the weapons receipt, but the weapons receipt was only a practice, not a policy. Chitwood's Dep. 90:1 - 91:6.

Mary Welsch filed this federal lawsuit seeking the return of her firearms, damages for the alleged violations of her constitutional rights, and a declaration the Upper Darby Firearm Policy is unconstitutional.[3] These issues are ripe for summary judgment.

**DISCUSSION**

A motion for summary judgment will only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon

---

[3] Mary Welsch's request for her firearms became moot when the Court approved a stipulation returning her firearms upon proof she lawfully owned the firearms and could legally possess firearms under Pennsylvania Uniform Firearms Act of 1995, 18 Pa.C.S. § 6101, et seq. Ct. Order (Dec. 11, 2007).

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the burden of proving no genuine issue of material fact is in dispute, and the court must review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Once the moving party has carried its initial burden, the nonmoving party must then "come forward with specific facts showing there is a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)). A motion for summary judgment will not be denied because of the mere existence of some evidence in support of the nonmoving party. The nonmoving party must present sufficient evidence for a jury to reasonably find for them on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

Mary Welsch contends it was unreasonable for the police to search and seize the firearms because they immediately knew the decedent had committed suicide with the gun closest to him. Detective Thrash and the other defendants assert Detective Thrash could not immediately determine it was a suicide and treated the incident as a death investigation, thus incriminating items in plain view could be lawfully seized. I agree.

Police "may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978). "If police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Potts v. City of Philadelphia*, 224 F. Supp. 2d 919, 936 (E.D. Pa. 2002) (citing *Minnesota v. Dickerson*,

508 U.S. 366, 374-75 (1993)).

Here, the record shows Officer Lutz saw the seized firearms in the kitchen and the decedent's bedroom and open closet. The 911 call of gun shots and the decedent's wound made the incriminating nature of these firearms "immediately apparent." *Id.* Because the officers were investigating the cause of this gun-related death, they had a right to seize the firearms in plain view.

Warrants are generally unnecessary to support a search or seizure in emergency situations, when the circumstances demand immediate action. *Camara v Municipal Court*, 387 U.S. 523, 540-41 (1967); *Showers v. Spangler*, 182 F.3d 165, 172-73 (3d Cir. 1999). The Fourth Amendment upholds warrantless searches and seizures when conducted reasonably in response to emergencies. *Camara*, 387 U.S. at 540-41; *Soldal v. Cook County*, 506 U.S. 56, 71 (1992) (" '[R]easonableness is still the ultimate standard' under the Fourth Amendment ...."). A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey*, 437 U.S. at 393 (citing *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).

In *Mincey*, the Supreme Court reversed a conviction where police had searched the defendant's apartment for four days after his alleged involvement in a shooting. *Mincey*, 437 U.S. at 388-89. The police in *Mincey* "opened drawers, closets, and cupboards, and inspected their contents: they emptied clothing pockets; they dug bullet fragments out of the wall; they pulled up sections of the carpet and removed them for examination." *Id.* They seized 200 to 300 items as evidence. *Id.* The Supreme Court permitted warrantless searches so long as they were initiated to "protect or preserve life or avoid serious injury" and were "strictly circumscribed by the exigencies which justify its initiation." *Id.* at 392-93. The excessive amount of time the police spent searching the apartment and the number of items seized defeated any argument of exigency or difficulty in

securing a warrant. *Id.*

Here, unlike *Mincey*, the record shows Detective Thrash and the responding Upper Darby officers acted reasonably in light of this emergency. Upon arrival, Detective Thrash knew the emergency involved a death and a gun shot. Although Welsch, Jr., and Kurtz said the decedent had shot himself, and the decedent's body, gun shot wound, and nearby .38 caliber suggest suicide, Detective Thrash knew the death could have been staged. *See, e.g, Marshall v. Hendricks,* 307 F.3d 36, 48 (3d Cir. 2002) (analyzing witness's testimony "that he and Marshall were on the Garden State Parkway looking for an appropriate site to stage the murder at the time in question"). Unlike *Mincey*, the police officers here limited their search to firearms, the cause of the death, and only searched where the firearms were located. The police conducted their search reasonably by limiting it to the nature of the emergency: a gun shot death.[4] Mary Welsch has thus failed to show a material issue of fact exists as to whether the Defendants acted unreasonably while responding to the 911 emergency phone call.

Alternatively, Eric Welsch, Jr. and Kurtz gave implied consent to the officers to search the home. Police can conduct a warrantless search if someone with authority gives voluntary consent. *United States v. Schneckloth*, 412 U.S. 218, 219-22 (1973). Common authority examines shared use of the property by persons with joint access or control "so that it is reasonable to recognize that any

---

[4] Mary Welsch also asserts the police acted unreasonably because they only searched and seized the decedent's firearms as opposed to the household's other weapons such as knives and swords. Detective Thrash and other officers asked only for the location of the firearms because a firearm was used to end the decedent's life. Detective Thrash could not immediately confirm suicide, but the decedent's wound informed Detective Thrash a firearm was used. His search and seizure was strictly circumscribed to the cause of the decedent's death: a firearm. It would have been unreasonable for the police to search for other types of weapons because they were not involved in the death, nor were they named in the 911 emergency call. *Mincey*, 437 U.S. at 388-89.

of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974). Consent can be express or implied. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005). Such consent, however, need not be expressed in a particular form but "can be found from an individual's words, acts or conduct." *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988) (citing *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981)). Consent must be voluntary, but need not be knowing or intelligent. *Lockett*, 406 F.3d at 211. Consent may also be given "unintentionally and without knowledge of the right to refuse consent, and the police are not required to warn an individual of the right to refuse consent." *Id*. A search is limited to "the terms of its authorization." *United States v. Cole*, 246 Fed. Appx. 112, 118 (3d Cir. 2007) (citing *Walter v. United States*, 447 U.S. 649, 656 (1980)).

The record shows Welsch, Jr. and Kurtz cooperated and voluntarily told the officers the locations of the firearms. The two men did not object or stop the police officers when they immediately dispersed and searched in those places. Neither man was coerced into providing this information and neither man's authority to give consent has been challenged.[5] The record indicates both men were cooperating with the police's investigation of the decedent.

Plaintiff argues implied consent cannot be found because police never specifically asked for consent. The totality of the circumstances, however, show Kurtz and Welsch, Jr. consented to the search. In *Potts v. City of Philadelphia*, Judge Anita Brody found Potts's cooperative conduct, including voluntarily revealing he owned a gun, the gun's location, and then physically bringing the

---

[5] Both men were over the age of 18 and lived in the home.

gun to the police, demonstrated he consented to the search. 224 F. Supp 2d. at 935-36. Similarly, Kurtz and Eric Welsch Jr.'s informative responses along with their knowingly "cooperative" behavior during the officers' search for firearms shows consent. Neither man brought the firearms to the police, but both men allowed them to search for the firearms. Both men knew the officers were searching for the firearms, but they did nothing to stop the police officers from searching. Dylan Kurtz's Dep. 13:1-18. The two men's overall cooperation made it reasonable for Detective Thrash and the other officers to believe they had consent to search those locations for firearms.[6]

---

[6] Alternatively, the officers involved in the search are also entitled to qualified immunity. Upon violating constitutional rights, Defendants are entitled to qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights." *Yarris v. County of Delaware*, 465 F.3d 129, 140 -141 (3d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants must prove their conduct did not violate a constitutional or statutory right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the Defendants' conduct was unconstitutional, they must demonstrate the constitutional or statutory right was not "clearly established" at the time the violation occurred. *Id.* Qualified immunity will be granted if the Defendant prevails on one of the two prongs. *Id.* (citing *Williams v. Bitner*, 455 F.3d 186, 190-91 (3d Cir. 2006)).

   Clearly established rights are rights "with contours sufficiently clear" a reasonable officer would understand his/her actions violate that right. *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (citing *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001)). This means at the time of the alleged violation, the officer must have had notice through precedent, "factually similar to the plaintiff's allegations," in similar context, the law and the Constitution would prohibit such conduct. *Id.* (citing *McLaughlin*, 271 F.3d at 572). The right to refuse consent to warrantless searches is not clearly established. *Grimm v. Sweeney*, 249 F. Supp. 2d 571, 618-20 (E.D. Pa. 2003). Also, it is reasonable for officers to follow instructions from a superior. *Showers v. Spangler*, 182 F.3d 165, 174 (3d Cir. 1999) (affirming qualified immunity for officers following orders of superior officer, whose qualified immunity was vacated and remanded).

   Here, there was not sufficient notice of a factually similar case for Detective Thrash. There was no precedent prohibiting the limited search and seizure of firearms during a gun-shot death investigation where two co-habitants informed police where to find the firearms and remained cooperative while police searched those locations. The record demonstrates police officers responded to a 911 call regarding a gun shot. It was reasonable for Detective Thrash to treat the scene as a death investigation instead of immediately determining it was a suicide. It was also reasonable for police to enter the other areas of the home and then seize the firearms in plain view. Plaintiff has failed to provide a factually similar case that would sufficiently put Detective Thrash on notice his decision for a confined and prompt search and seizure of firearms (only in rooms they knew firearms were) during a gun shot death investigation was unreasonable.

10

Mary Welsch has also sought declaratory relief the Upper Darby gun policy is unconstitutional because it violates due process, the Equal Protection Clause, and provides Superintendent Chitwood with unfettered discretion. Defendants assert the policy complies with due process and the Equal Protection Clause. I will partially grant the motion to the extent the weapons receipt and the gun policy require a court order to return their firearms. I will partially deny the summary judgment motion and declare the gun policy unconstitutional because it provides Superintendent Chitwood with unfettered discretion in determining who receives their firearms without a court order and how. Further, material issues of fact exist as to whether Upper Darby's gun policy or the weapons receipt practice was Upper Darby's official policy and whether it was applied to Mary Welsch.

Regarding Upper Darby policy and weapons receipt, requiring people to obtain a court order for firearms mirrors the requirement of Pennsylvania Rule of Criminal Procedure 588 which permits "a person aggrieved by a search and seizure" to file a motion for return of property "in the court of common pleas for the judicial district in which the property was seized." Pa. R Crim. P. 588. Courts have upheld this rule and similar rules as complying with due process by providing adequate post-deprivation remedies. *See, e.g., Potts v. City of Phila.*, 224 F. Supp. 2d 919, 938 (E.D. Pa. 2002) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available"); *Taylor v. Naylor,* 2006 WL 1134940, at * 3 -4 (W.D. Pa. Apr. 26, 2006) (finding

---

The record also shows Officers Fitzpatrick and Brown searched and seized firearms upon direction of their superior. It was reasonable for these officers to follow the instructions of their superior. *Spangler*, 182 F.3d at 174.

Pa. R. Crim. P. 588, replevin, and conversion statutes adequate post-deprivation remedies for detained and eventually destroyed personal property); *Marsh v. Ladd,* 2004 WL 2441088, at * 6 -7 (E.D. Pa. Oct. 27, 2004) (finding plaintiff had adequate post-state remedies in replevin and conversion); *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675, 694-96 (D. Md. 2006), *affirmed as modified by Mora v. The City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008) (finding Section 1-203 of the Criminal Procedure Article of the Maryland Code return property law, which was similar to Pa R. Crim. 588 constitutional).

Mary Welsch contends Pa. Rule of Criminal Procedure 588 only applies to criminal cases. Mary Welsch is wrong. Rule 588's broad language addresses all "aggrieved by a seizure." It does not limit the recourse to only those involved in a criminal matter. Further, Pennsylvania has recognized the Rule 588 proceedings as civil in form, but "quasi-criminal in character." *Commonwealth v. Howard*, 931 A.2d 129, 131 (Pa. Cmwlth. 2007).

The record also fails to support Mary Welsch's substantive due process and Equal Protection claims. As to substantive due process, Mary Welsch must show the requirement to obtain a court order for firearms is "arbitrary" or the "most egregious official conduct." *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 399 (3d Cir. 2003). To prevail, Welsch must show Upper Darby's deprivation of her firearms "shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists*, 316 F.3d at 400-02). Requiring individuals to obtain a court order to retrieve their firearms which were lawfully taken is not egregious nor does it shock the conscience.

In order to prove her Equal Protection Clause claim, Mary Welsch must show the requirement of a court order for firearms or any weapon used to threaten an individual is not

"rationally related to legitimate governmental objectives." *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). Rational basis is the least critical of the three standards of review and will be met so long as "any state of facts reasonably may be conceived to justify it." *Santa Fe Natural Tobacco Co., Inc. v. Judge*, 963 F. Supp. 437, 441 (M.D. Pa. 1997) (citing *Bowen v. Gilliard*, 483 U.S. 587, 601 (1987)). Upper Darby justifies the requirement because the need for extra safety precautions as to firearms and other weapons, such as baseball bats, used to threaten individuals. Because the record lacks the exact language of Upper Darby property receipts, the Court is limited to the weapons receipt and Superintendent Chitwood's explanation of how some non firearm weapons are placed on weapons receipts. Even if firearms were treated differently, the purpose of keeping the community safe meets the rational basis test. *Cf. District of Columbia v. Heller*, 128 S. Ct. 2783, 2817-19 (2008) (discussing permissible rational basis limitations on firearm law, but prohibiting complete ban on right to possess firearms in one's own home).

When asked for declaratory relief, district courts, not juries, are to interpret the constitutionality of the disputed policy. 28 U.S.C. § 2201.[7] Granting unfettered discretion to city officials or police is unconstitutional because it can lead to "arbitrary deprivations of liberty

---

[7] This section reads:
    (a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2201

interests" and/or creates the potential to abuse power at the expense of another. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A policy is unconstitutional when "it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Kolender*, 461 U.S. at 358. Minimal guidelines are required to avoid a standardless enforcement of regulations. *Id.* The Supreme Court invalidated a California statute because it allowed officers to determine whether a suspect provided "credible and reliable" identification to avoid a disorderly conduct citation. *Id.* at 360. The lack of guidelines as to "credible and reliable" furnished the officers the opportunity to "harsh and discriminatory enforcement." *Id.* (citing *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 170 (1972)).

Courts have further found "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757 (1988) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969); *Cox v. Louisiana*, 379 U.S. 536 (1965); *Staub v. City of Baxley*, 355 U.S. 313, 321-22 (1958); *Kunz v. New York*, 340 U.S. 290, 294 (1951); *Niemotko v. Maryland*, 340 U.S. 268 (1951); *Saia v. New York*, 334 U.S. 558 (1948)). The Supreme Court has explained "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id*.

The Upper Darby firearm policy allows the return of firearms upon showing of a court order or by permission of Superintendent Chitwood. Chitwood's unfettered discretion is unconstitutional. Similar to *Kolender* and *Lakewood,* the policy provides Chitwood full discretion to decide among

those seeking their firearms who does or does not need a court order. The policy fails to explain what documents, conduct, or circumstances would only merit Chitwood's permission, instead of a court order. No limits are placed on Chitwood's determination. Chitwood's unfettered discretion can lead to arbitrary enforcement and the potential for an abuse of power. *Kolender*, 461 U.S. at 358; *Lakewood,* 486 U.S. at 757. Similarly to those *Lakewood* license applicants, Mary Welsch is subject to the whim of Superintendent Chitwood. Such unfettered and unbridled discretion could lead to arbitrary discriminatory enforcement and ultimately self-censorship.

Superintendent Chitwood and Upper Darby argue the requirement for a court order curtails Superintendent Chitwood's discretion, and therefore the policy is constitutional. This argument fails. The policy does not explain which circumstances justify a court order or Superintendent Chitwood's permission. Superintendent Chitwood explains he would not require a court order if an applicant could provide proof of lawful ownership of firearms and ability to lawfully possess firearms. Mary Welsch, however, needed to obtain a court order showing she had proof of lawful ownership and she could lawfully possess firearms.

Finally, Defendant Upper Darby Township moves for summary judgment on the grounds Mary Welsch has failed to meet her burden under *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-91 (1978). A township may be liable for federal or constitutional violation under § 1983 "only for acts implementing an official policy, practice or custom of the municipality." *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-691 (1978). A plaintiff must identify the challenged policy, pattern or practice, attribute it to the municipality, and demonstrate its application caused the plaintiff's injury. *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984); *Russoli v. Salisbury Township*, 126 F. Supp. 2d. 821, 839 (E.D. Pa. 2001).

I will grant Upper Darby's motion as to Mary Welsch's Fourth Amendment allegation because the record, as previously discussed, fails to prove any constitutional deprivation or injury. Consequently, no defective policy, training, or supervision can be alleged or proven. *Cronin,* 994 F. Supp. at 599 n.7 (dismissing *Monell* claim against township because no constitutional violation existed). I will deny the motion as to the Upper Darby Firearm Policy. Mary Welsch has identified and provided evidence of Upper Darby's Firearm policy. The jury will decide whether the weapons receipt or the firearm policy created her injury. I reserve ruling on whether Superintendent Chitwood has qualified immunity until the end of trial.

An appropriate order so follows.